IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

MONICA L. HENRICKSON                                    PLAINTIFF

        v.                        CIVIL NO. 14-5054

CAROLYN W. COLVIN, Commissioner
Social Security Administration                          DEFENDANT

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, Monica L. Henrickson, brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration (Commissioner) denying her claims for a period of disability and disability insurance benefits (DIB) and supplemental security income (SSI) benefits under the provisions of Titles II and XVI of the Social Security Act (Act).  In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision.  See 42 U.S.C. § 405(g).

I.       **Procedural Background**:

Plaintiff protectively filed her current applications for DIB and SSI on October 9, 2008, alleging an inability to work since December 1, 2000,[1] due to bipolar disorder, depression, and fibromyalgia.  (Tr. 251, 255, 284).  For DIB purposes, Plaintiff maintained insured status through December 31, 2006.  (Tr. 17, 267).

---

[1] Plaintiff, through her counsel, amended her alleged onset date to July 1, 2002.  (Tr. 17, 40).

On August 11, 2010, an Order of Dismissal was entered following Plaintiff's counsel's February 17, 2010, letter asking to withdraw Plaintiff's request for a hearing.  (Tr. 80, 139).

On November 22, 2010, the Appeals Council vacated the ALJ's dismissal, and remanded the case back to the ALJ for further proceedings, as it appeared Plaintiff did not understand the impact of her withdrawal of her request for a hearing.  (Tr. 73-76).

An administrative hearing was held on April 9, 2012, at which Plaintiff appeared with counsel and testified. (Tr. 37-68).

By written decision dated July 24, 2012, the ALJ found that during the relevant time period, Plaintiff had an impairment or combination of impairments that were severe. (Tr. 19). Specifically, the ALJ found Plaintiff had the following severe impairments: arthralgias, generalized anxiety disorder, bipolar disorder NOS, cannabis abuse in alleged remission, and obsessive compulsive disorder. (Tr. 19).   However, after reviewing all of the evidence presented, the ALJ determined that Plaintiff's impairments did not meet or equal the level of severity of any impairment listed in the Listing of Impairments found in Appendix I, Subpart P, Regulation No. 4.  (Tr. 20).  The ALJ found Plaintiff retained the residual functional capacity (RFC) to:

> perform medium work as defined in 20 CFR 404.1567(c) and 416.967 (c) except the claimant can perform work which is limited to simple, routine and repetitive tasks, involving only simple, work-related decisions, with few if any, workplace changes and no more than incidental contact with co-workers, supervisors and the general public.

(Tr. 21).  With the help of a vocational expert, the ALJ determined Plaintiff could perform work as a dishwasher, and a grocery sacker.  (Tr. 28).

Plaintiff then requested a review of the hearing decision by the Appeals Council, which after reviewing additional medical evidence, denied that request on December 4, 2013. (Tr. 1-

4).  Subsequently, Plaintiff filed this action.  (Doc. 1).  Both parties have filed appeal briefs, and the case is before the undersigned for report and recommendation.  (Docs. 15, 16, 19).

The Court has reviewed the entire transcript.  The complete set of facts and arguments are presented in the parties' briefs, and are repeated here only to the extent necessary.

## II.    **Evidence Presented:**

At the time of the administrative hearing held before the ALJ, Plaintiff was forty-five years of age and had obtained a twelfth grade education.

The pertinent medical evidence in this case reflects the following.  On April 15, 2008, Plaintiff was seen in the Washington Regional Diagnostic Clinic with complaints of insomnia, joint pain, and depression.  (Tr. 325).  Plaintiff reported that she smoked one and one-half package of cigarettes a day.  Plaintiff was diagnosed with arthralgias, gastroesophageal reflex disease (GERD), tobacco abuse, and a mood disorder.  It was recommended that Plaintiff follow-up with a psychiatrist for an evaluation and care.

On November 13, 2008, Dr. David L. Hicks, a non-examining medical consultant, completed a RFC assessment stating that Plaintiff could occasionally lift or carry fifty pounds, frequently lift or carry twenty-five pounds; could stand and/or walk for a total of about six hours in an eight-hour workday; could sit about six hours in an eight-hour workday; and could push or pull unlimited, other than as shown for lift and/or carry. (Tr. 341-348).  Dr. Hicks opined that postural, manipulative, visual, communicative or environmental limitations were not evident.  After reviewing additional evidence of record Dr. Bill F. Payne affirmed Dr. Hicks' assessment on January 29, 2009. (Tr. 376).

On December 4, 2008, Plaintiff underwent a Mental Diagnostic Evaluation performed by Dr. Terry L. Efird.  (Tr. 349-353).  Plaintiff drove herself to the hearing, and presented

appropriately dressed and groomed.  Plaintiff reported to Dr. Efird that she could not keep a job due to her bipolar disorder, which had been diagnosed by her primary care physician. Plaintiff reported cleaning her house a lot, and overspending when she was experiencing an elevated mood.  Plaintiff denied a history of psychiatric treatment and reported that she was taking Symbrax and meloxicam. Plaintiff reported taking the medications as prescribed, and that she experienced dry mouth, nausea and feeling "wired."  Plaintiff reported that she had been taking the Symbrax for about three weeks and had not noticed remarkable benefits. Financial obstacles to treatment were reported.  When asked about basic self-care tasks, Plaintiff reported that she had gone three days, at times, without showering or brushing her hair when she was depressed.  Plaintiff reported that she was able to keep her house clean. Plaintiff reported that she had been self-employed in a partnership making candles about three years ago.  Plaintiff reported that she had had difficulty dealing with stress, being around people, and not wanting to do that type of work.  Plaintiff reported difficulty holding a job for any length of time secondary to becoming depressed and not going to work.  Plaintiff reported that she drank about two glasses of wine per night, and smoked marijuana on a daily basis. Plaintiff reported she started smoking marijuana at an early age but that she stopped using marijuana at different periods in her life.  Plaintiff denied having smoked marijuana prior to the evaluation.  Dr. Efird diagnosed Plaintiff with a generalized anxiety disorder, bipolar disorder NOS, and cannabis abuse.

With respect to adaptive functioning, Dr. Efird noted that Plaintiff endorsed the ability to drive unfamiliar routes, but reported being anxious in traffic and vomiting at times. While the ability of shopping independently was endorsed, Plaintiff reported that her husband did quite a bit of the shopping.  Plaintiff reported having problems with anxiety around large

groups of people. Plaintiff endorsed the ability to perform most activities of daily living

satisfactorily. Plaintiff reported interacting with her neighbors about three times a week. Dr.

Efird opined that Plaintiff had the capacity to perform basic cognitive tasks required for basic

work like activities. Dr. Efird noted no remarkable problems with attention/concentration,

persistence or pace during the evaluation. With respect to the validity of the evaluation, Dr.

Efird stated as follows:

> Clinically, I had the impression of someone who tends to overreact to and/or
> embellish information, and possibly be more focused on impression. Therefore,
> a degree of symptom exaggeration may have occurred; and, a mild to moderate
> degree of impairment in adaptive functioning was suggested at this time.
> Otherwise, clear, obvious evidence of malingering was not noted, and the
> present results are viewed as likely representing a reasonable estimate of current
> functioning.

(Tr. 353).

On December 9, 2008, Dr. Jay Rankin, a non-examining medical consultant, completed

a mental RFC assessment stating Plaintiff had moderate limitations in the following areas: the

ability to carry out detailed instructions; the ability to maintain attention and concentration for

extended periods; the ability to sustain ordinary routine without special supervision without

being distracted by them; the ability to complete a normal workday and workweek without

interruptions from psychologically based symptoms and to perform at a consistent pace

without an unreasonable number and length of rest periods; the ability to accept instructions

and respond appropriately to criticism from supervisors; the ability to respond appropriately to

changes in the work setting; and the ability to set realistic goals or make plans independently

of others. (Tr. 369-371). Dr. Rankin made the following additional comments:

> The claimant is able to perform work where interpersonal contact is incidental
> to work performed, e.g. assembly work; complexity of tasks is learned and

5

performed by rote, few variables, little judgement; supervision required is simple, direct and concrete.  (Unskilled).

(Tr. 371).  On the same date, Dr. Rankin completed a psychiatric review technique form indicating Plaintiff had mild restrictions of her activities of daily living; moderate difficulties in maintaining social functioning; moderate deficiencies of concentration persistence or pace; and had no episodes of decompensation. (Tr. 356-368).  After reviewing additional evidence of record, Dr. Jerry R. Henderson affirmed Dr. Rankin's assessment on January 28, 2009.  (Tr. 377).

On January 5, 2009, Plaintiff was seen at Ozark Guidance requesting help with her bipolar disorder.  (Tr. 394-401).  Plaintiff reported she was "tired of feeling this way."  Plaintiff reported that her depression was more prevalent than her manic episodes.  Plaintiff indicated that she had only been treated by primary care physicians and never mental health providers.  While she had been prescribed Cymbalta and Celexa in the past, Plaintiff reported that she had been taking Symbrax for approximately six weeks.  Plaintiff denied any abuse when growing up, but said it was not a loving environment.  Plaintiff reported that she raised Chihuahuas.  Plaintiff was noted as being emotionally unstable.  Plaintiff was noted as using cannabis occasionally.  It was recommended that Plaintiff attend both individual and group therapy.

On February 13, 2009, a treatment plan was established for Plaintiff at Ozark Guidance.  (Tr. 402-406).  Plaintiff was noted as not present at the time the treatment plan was established.

On February 19, 2009, Plaintiff attended individual therapy at Ozark Guidance.  (Tr. 407-408).  Plaintiff reported that she continued to feel extreme depression which caused daily impairments to the point that she often could not leave her home or feel any motivation.

6

On February 27, 2009, Plaintiff attended individual therapy at Ozark Guidance.  (Tr. 409-410).  Plaintiff continued to show extreme depression with self-report and observation. There was no change from the previous session.

On March 20, 2009, Plaintiff was seen for individual therapy at Ozark Guidance.  (Tr. 411-412).  Plaintiff reported that she was feeling "ill" and had been recovering from the flu. Plaintiff talked about feeling depressed and how the depression was affecting her life.  Plaintiff reported little to no motivation, and that she left the house only when she had to leave.  Plaintiff reported being tearful and feeling hopeless.  The therapist noted that Plaintiff looked like she was in need of a bath.

On April 1, 2009, Plaintiff was seen by Mary Ann Adams, APN, at Ozark Guidance. (Tr. 413-414).  Plaintiff reported that there had been "another suicide in my family."  Plaintiff reported that her cousin, who had been fighting depression, killed himself.  Plaintiff described her husband as a "drunk."  Plaintiff was noted to have ups and downs.  Plaintiff reported that she cried all of the time and did not like to be around people because she felt like a loser. Plaintiff reported that in the past she had taken Effexor XR which helped, but that she no longer could afford this medication.  Nurse Adams indicated that she was going to try Plaintiff on Pristiq, and if this medication helped they would apply for PAP.  Plaintiff reported that she felt people were out to get her and she worried that her neighbors would burn her house down.  She also felt that another person would "put a spell" on her.

On April 22, 2009, Plaintiff was seen by Nurse Adams at Ozark Guidance.  (Tr. 415-416).  Plaintiff reported that she felt far too sedated and weird on the Prestiq.  Nurse Adams changed the medication to Celexa and a low dose of Abilify.

On May 6, 2009, Plaintiff was seen by Nurse Adams at Ozark Guidance. (Tr. 417-418). Plaintiff reported a significant improvement in her mood since starting Celexa and Abilify. Plaintiff reported that she continued to hear noises and occasionally thought someone was calling her name.  Plaintiff reported becoming very anxious when she was in crowds or busy traffic.  Nurse Adams increased Plaintiff's Abilify dosage.

On June 30, 2009, Plaintiff was seen by Diane H. Lyddon, MNSC, APN, for a medication management appointment at Ozark Guidance.  (Tr. 419-420).  Plaintiff reported that she had been doing about the same and that the increase in the Abilify had been somewhat beneficial as it helped with the mood swings.  Plaintiff reported that she continued to feel mad and angry a lot of the time.  Plaintiff thought her mood might be just a little bit better because she had been doing more things around the house.  Plaintiff's Celexa dosage was increased. Nurse Lyddon also noted that Plaintiff would need an appointment with Dr. Salvador.

On July 9, 2009, a treatment plan review indicated that Plaintiff had been compliant with doctor appointments.  (Tr. 425).  The review indicated that a letter would be sent to Plaintiff about complying with attending group therapy.

On August 17, 2009, Plaintiff was seen by Nurse Adams at Ozark Guidance.  (Tr. 426-427).  Plaintiff reported that her mood swings were stable.  Plaintiff reported that she was not irritable but that she was still depressed.  Plaintiff reported that she did not cry all of the time but that she did get anxious when she left the house.  Plaintiff also reported some mild tremors in her hands.  Plaintiff reported that her sleep had improved. Plaintiff's medications were adjusted, and it was noted that she needed a medical consult as soon as possible because she had not yet seen a physician.

On August 17, 2009, Plaintiff was also seen by Audrey Adams, LCSW, for individual therapy. (Tr. 428-429). Counselor Adams noted that this was her first time to see Plaintiff as the previous therapist was no longer working with Ozark Guidance. Plaintiff reported that she had a lot of anxiety and that she stayed inside a lot. Counselor Adams discussed changes in treatment and encouraged Plaintiff to participate in group therapy. Plaintiff agreed to attend group orientation. Plaintiff was noted as being pleasant, attentive, and calm.

On August 31, 2009, Plaintiff underwent a psychiatric assessment with Dr. Ester Arejola Salvador. (Tr. 430-437). Plaintiff reported thoughts and feelings of helplessness, hopelessness, worthlessness and suicidal ideation. Plaintiff reported that she sometimes heard someone calling her name or heard the phone ringing. Plaintiff reported that she liked things to be kept in their exact place and wanted a tidy home. Plaintiff reported that after her parents divorced she went to live with her dad. However, she ran away because her family called her names. Plaintiff reported that she went to live with friends. Plaintiff reported that she had a good relationship with her parents now. Plaintiff reported that she smoked one and one-half packages of cigarettes a day, and that she smoked marijuana daily. The most recent joint had been smoked the previous day. Dr. Salvador opined that Plaintiff's estimated IQ fell within the average range, and that Plaintiff's insight and judgment were fair. Plaintiff was given samples for Pristiq and Abilify, and instructed to follow-up in one month.

On October 13, 2009, Ozark Guidance indicated that Plaintiff had lost contact. (Tr. 438).

On November 3, 2011, Plaintiff was seen at the Community Clinic. (Tr. 392-393). Plaintiff reported that she was always in pain. Plaintiff was assessed with a tobacco use

disorder, chronic pain syndrome, depression with anxiety, polyarthralgia, restless leg syndrome, and a fasting glucose impairment.  Plaintiff reported that she was not ready to quit smoking.  She was started on Amitriptyline.  There was a question as to whether Plaintiff's chronic pain was caused by fibromyalgia.

On December 7, 2011, Plaintiff was seen at the Community Clinic for a follow-up appointment.  (Tr. 391).  Plaintiff reported she was taking hormones, but could not remember the name.  Plaintiff reported that her pain was tolerable with the use of Amitriptyline, and that Mirapex helped with the restless leg syndrome.  Plaintiff was assessed with restless leg syndrome, polyarthralgia, chronic pain syndrome, and depression with anxiety. Plaintiff was also noted as being overweight.

On January 8, 2012, Plaintiff called the Community Clinic to report that her joint pain had increased, and that the Meloxicam was not working. (Tr. 390). Plaintiff requested a different medication.  Plaintiff was instructed to increase her Amitriptyline.

On February 16, 2012, Plaintiff was seen at the Community Clinic with complaints of joint pain, sinus pain, and yellow nasal drainage.  (Tr. 387-388).  Plaintiff reported that she stopped taking Mobic due to dryness of the throat.  Dr. Marianela Lavena noted that RA (Rheumatoid Arthritis) labs were ordered and that they were negative.  Plaintiff was assessed with polyarthralgia, chronic pain syndrome and sinusitis.

On March 13, 2012, Plaintiff was seen at Ozark Guidance, and was diagnosed with post-traumatic stress disorder, a mood disorder, and alcohol abuse.  (Tr. 378-381).  Evaluation notes indicate that Plaintiff had an experience that had brought up her past traumas from childhood.  Plaintiff reported that her earliest age of abuse was at the age of six, and that the

10

abuse continued until she was in her teens.  Plaintiff reported she was sexually abused by her uncle, cousin's husband, her brother, and her step-father.  At the time, Plaintiff's mother did not believe Plaintiff.  Plaintiff reported she was raped by a man she barely knew when she was twenty-one, which resulted in a pregnancy, and the child was adopted out.  Plaintiff also reported that she was usually depressed, but that she felt a "high" about five days of the month. Plaintiff reported that she started drinking about three years ago in order to cope with her husband's alcohol abuse.  Plaintiff reported that she abused alcohol about once a week.  It was recommended that Plaintiff attend both individual and group therapy.

On March 27, 2012, Plaintiff was seen at Ozark Guidance for individual therapy.  (Tr. 448-449).  Therapy notes indicate Plaintiff had been seen for treatment before but in the last few years her husband lost his job, and they filed for bankruptcy.  Plaintiff reported that there was a family argument last night and that now someone was staying with her.  Plaintiff reported experiencing a panic attack last night and that her head felt like it was floating.  Plaintiff's abuse of substances was discussed during this session.

On April 6, 2012, Plaintiff was seen at the Community Clinic by Dr. Lavena.  (Tr. 385). Plaintiff complained of abdominal pain that started when Plaintiff started taking a hormone supplement.  Plaintiff reported that she smoked daily, and that she drank a couple of glasses of wine every night.  Plaintiff's medications included Advil, Amitriptyline and Mirapex.  After an examination, Plaintiff was diagnosed with polyarthralgia and GERD.

On April 11, 2012, Plaintiff was seen for individual therapy at Ozark Guidance.  (Tr. 450-451).  Coping skills and applying them to Plaintiff's life were discussed.  Plaintiff reported that she had the chills and woke up each morning with the shakes.

11

The following records were submitted to the Appeals Council.  Medical records dated January 9, 2006, through November 5, 2010, from Kent Moore Chiropractic reveal that Plaintiff sought treatment for diffuse pain. (Tr. 452).

Plaintiff was also treated by Dr. Paul Daidone from August 13, 2012, through January 22, 2013.  (Tr. 453-467).  On August 13, 2012, Plaintiff reported that she bruised easily and that she had fallen five times in the last six to seven months.  Plaintiff thought that she might have restless leg syndrome, and that another doctor had diagnosed her with fibromyalgia and bipolar disorder.  Plaintiff reported that she had pain all over, that she possibly had a diagnosis of rheumatoid arthritis, and that her doctor wanted to refer her to a rheumatologist.  Plaintiff reported that she could not hold a potato peeler or anything.  Upon examination, Dr. Daidone noted Plaintiff had no bone, joint, tendon or muscle abnormalities.  Plaintiff was noted as alert and oriented with no major deficits of coordination or sensation.  Plaintiff was assessed with chronic pain syndrome and joint problems/pain.  Plaintiff signed a pain contract. Dr. Daidone prescribed Amitriptyline and Norco/Hydrocodone-Acetaminophen.  Plaintiff appears to have been treated for left shoulder pain in September of 2012, and then for lateral epicondylitis in January of 2013.

## III.    Applicable Law:

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole.  Ramirez v. Barnhart, 292 F.3d 576, 583 (8th Cir. 2002).  Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision.  The ALJ's decision must be affirmed if the record contains substantial evidence to support it.  Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003).  As long as there is substantial evidence in the record that

supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently.  Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).  In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed.  Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir.2001); see also 42 U.S.C. § § 423(d)(1)(A), 1382c (a)(3)(A).  The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."   42 U.S.C. §§ 423(d)(3), 1382(3)(C).  A Plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience.  See 20 C.F.R. §§ 404.1520, 416.920.  Only if the final stage is reached does the fact finder consider the Plaintiff's age,

education, and work experience in light of her residual functional capacity.  See McCoy v. Schweiker, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. §§ 404.1520, 416.920.

## IV.  Discussion:

Plaintiff appears to argue the following issues on appeal: 1) the ALJ erred in determining Plaintiff's severe impairments; 2) the ALJ erred in determining Plaintiff's credibility; 3) the ALJ erred in determining Plaintiff's RFC; 4) the ALJ erred in determining the impact of Plaintiff's global assessment of functioning (GAF) scores; and 5) the ALJ did not propose a proper hypothetical question to the vocational expert.

### A.  Insured Status:

In order to have insured status under the Act, an individual is required to have twenty quarters of coverage in each forty-quarter period ending with the first quarter of disability.  42 U.S.C. § 416(i)(3)(B).  Plaintiff last met this requirement on December 31, 2006.  Regarding Plaintiff's application for DIB, the overreaching issue in this case is the question of whether Plaintiff was disabled during the relevant time period of July 1, 2002, her amended alleged onset date of disability, through December 31, 2006, the last date she was in insured status under Title II of the Act.

In order for Plaintiff to qualify for DIB she must prove that, on or before the expiration of her insured status she was unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which is expected to last for at least twelve months or result in death.  Basinger v. Heckler, 725 F.2d 1166, 1168 (8th Cir. 1984). Records and medical opinions from outside the insured period can only be used in "helping to elucidate a medical condition during the time for which benefits might be rewarded." Cox v. Barnhart,

14

471 F.3d 902, 907 (8th Cir.2006) (holding that the parties must focus their attention on claimant's condition at the time she last met insured status requirements).

### B.    Severe Impairments:

At Step Two of the sequential analysis, the ALJ is required to determine whether a claimant's impairments are severe. See 20 C .F.R. § 404.1520(c).  To be severe, an impairment only needs to have more than a minimal impact on a claimant's ability to perform work-related activities. See Social Security Ruling 96-3p. The Step Two requirement is only a threshold test so the claimant's burden is minimal and does not require a showing that the impairment is disabling in nature. See Brown v. Yuckert, 482 U.S. 137, 153-54 (1987).  The claimant, however, has the burden of proof of showing she suffers from a medically-severe impairment at Step Two.  See Mittlestedt v. Apfel, 204 F.3d 847, 852 (8th Cir. 2000).

The ALJ clearly considered all of Plaintiff's impairments, including the impairments that were found to be non-severe.  See Swartz v. Barnhart, 188 F. App'x 361, 368 (6th Cir. 2006) (where ALJ finds at least one "severe" impairment and proceeds to assess claimant's RFC based on all alleged impairments, any error in failing to identify particular impairment as "severe" at step two is harmless); Elmore v. Astrue, 2012 WL 1085487 *12 (E.D. Mo. March 5, 2012); see also 20 C.F.R. § 416.945(a)(2) (in assessing RFC, ALJ must consider "all of [a claimant's] medically determinable impairments ..., including ... impairments that are not 'severe' "); § 416.923 (ALJ must "consider the combined effect of all [the claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity").  The Court finds the ALJ did not commit reversible error in setting forth Plaintiff's severe impairments.

### C.      Subjective Complaints and Credibility Analysis:

The ALJ was required to consider all the evidence relating to Plaintiff's subjective complaints including evidence presented by third parties that relates to:  (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of her pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of her medication; and (5) functional restrictions.  See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole. Id.  As the United States Court of Appeals for the Eighth Circuit observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003).

After reviewing the administrative record, it is clear that the ALJ properly considered and evaluated Plaintiff's subjective complaints, including the Polaski factors.  In determining Plaintiff's credibility, the ALJ noted that Plaintiff sought sporadic treatment for her alleged disabling impairments, and that medication helped to improve her symptoms.

The ALJ also found that Plaintiff's activities during the relevant time period were not consistent with a disabling condition.  A review of the record reveals that during the relevant time period, Plaintiff reported that she raised Chihuahuas, she was able to perform household chores, she was able to drive, she was able to shop independently, she was able to perform activities of daily living independently, she made and sold candles for about four years during the relevant time period, she cleaned a home for someone during the relevant time period, and she interacted with her neighbors about three times per week.  (Tr. 41-43, 350-352, 396).

16

While Plaintiff alleged an inability to seek treatment due to a lack of finances, the record is void of any indication that Plaintiff had been denied treatment due to the lack of funds. Murphy v. Sullivan, 953 F.3d 383, 386-87 (8th Cir. 1992) (holding that lack of evidence that plaintiff sought low-cost medical treatment from her doctor, clinics, or hospitals does not support plaintiff's contention of financial hardship). The record further reveals that Plaintiff was able to come up with the funds to purchase cigarettes, alcohol and marijuana on a consistent basis during the relevant time period.

Plaintiff argues that the ALJ failed to discuss a letter written by Plaintiff's friend, Debbie L. Huskey, dated April 8, 2012. (Tr. 342). While it would have been preferable for the ALJ to have addressed Ms. Huskey's letter, in this particular case, the Court finds that the ALJ's "arguable deficiency in opinion-writing," had no bearing on the outcome of Plaintiff's case and does not require remand. Buckner v. Astrue, 646 F.3d 549, 559-60 (8th Cir. 2011) (quotation and citation omitted).

Therefore, although it is clear that Plaintiff suffers with some degree of limitation, she has not established that she was unable to engage in any gainful activity during the time period in question. Accordingly, the Court concludes that substantial evidence supports the ALJ's conclusion that Plaintiff's subjective complaints were not totally credible.

### D.    The ALJ's RFC Determination:

RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1). It is assessed using all relevant evidence in the record. Id. This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of her limitations. Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005);

17

Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004).  Limitations resulting from symptoms such as pain are also factored into the assessment.  20 C.F.R. § 404.1545(a)(3).  The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question."  Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).  Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace.  Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003).  "[T]he ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect his RFC."  Id.

In determining that Plaintiff maintained the RFC to perform medium work with limitations, the ALJ considered the medical assessments of the examining and non-examining agency medical consultants; Plaintiff's subjective complaints; and her medical records.  Plaintiff's capacity to perform this level of work is supported by the fact that Plaintiff's examining physicians placed no restrictions on her activities that would preclude performing the RFC determined during the relevant time period.  See Hutton v. Apfel, 175 F.3d 651, 655 (8th Cir. 1999) (lack of physician-imposed restrictions militates against a finding of total disability).  After reviewing the entire transcript, the Court finds substantial evidence supporting the ALJ's RFC determination for the time period in question.

**E.      GAF Scores:**

Plaintiff argues the ALJ did not properly consider Plaintiff's GAF scores. In his decision, the ALJ discussed in some detail Plaintiff's GAF scores, recognizing that her scores were between 40 and 65. (Tr. 26, 353, 378, 394, 436).  However, he did not find the GAF scores to be a reliable measure of functional ability "as GAF scores reveal only a picture in time and do not necessarily correlate with disability. " (Tr. 26). He concluded that while the

18

scores would be useful in tracking the effectiveness of mental health treatment, they would not be as significant in determining disability. (Tr. 26).

A GAF score is not essential to the RFC's accuracy.  Howard v. Commissioner of Social Security, 276 F.3d 235, 241 (6th Cir. 2002). "[A]n ALJ may afford greater weight to medical evidence and testimony than to GAF scores when the evidence requires it." Jones v. Astrue, 619 F.3d 963, 974 (8th Cir. 2010).

The Court believes the ALJ properly considered the GAF scores in weighing the record as a whole, and accounted for mental limitations in the RFC assessment by restricting Plaintiff to unskilled work.

### F.    Hypothetical Question to the Vocational Expert:

After thoroughly reviewing the hearing transcript along with the entire evidence of record, the Court finds that the hypothetical the ALJ posed to the vocational expert fully set forth the impairments which the ALJ accepted as true and which were supported by the record as a whole. Goff v. Barnhart, 421 F.3d 785, 794 (8th Cir. 2005).  Accordingly, the Court finds that the vocational expert's opinion constitutes substantial evidence supporting the ALJ's conclusion that Plaintiff's impairments did not preclude her from performing work as a dishwasher, and a grocery sacker.   Pickney v. Chater, 96 F.3d 294, 296 (8th Cir. 1996)(testimony from vocational expert based on properly phrased hypothetical question constitutes substantial evidence).

19

**V.      Conclusion:**

Based on the foregoing, the Court recommends affirming the ALJ's decision, and dismissing Plaintiff's case with prejudice.  **The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 29th day of September, 2015.


/s/ *Erin L. Setser*
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE